## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AXIANT, LLC, | Case No. 09-14118 (___) |
| Debtor.[1] | |

## DECLARATION OF KEITH BOLT IN SUPPORT
## OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Keith Bolt, being duly sworn, depose and say:

      1.     I am the Executive Vice President and Chief Financial Officer of Axiant, LLC ("**Axiant**"), a limited liability company organized under the laws of the state of Delaware and the debtor and debtor-in-possession (the "**Debtor**" or the "**Company**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**"). I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtor.

      2.     As Executive Vice President and Chief Financial Officer of Axiant, I am responsible for overseeing the financial activities of the Company, including but not limited to, monitoring cash flow, and tax and financial planning. As a result of my tenure with the Debtor, my review of public and non-public documents, and my discussions with other members of the Debtor's management team, I am familiar with the Company's business, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtor's employees or retained advisers that report to me in the ordinary

---

[1]     The federal tax identification number of the Debtor in this case is 20-5784333, and the mailing address is 9930 Kincey Avenue, 3rd Floor, Huntersville, North Carolina 28078, (Attn: Kevin Keleghan, President and CEO).

course of my responsibilities. I am authorized by the Debtor to submit this First Day Declaration. References to the Bankruptcy Code, the chapter 11 process and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3. On November 20, 2009 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief in the Bankruptcy Court for the District of Delaware (the "**Court**"). The Debtor continues to manage its assets as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No official committee of unsecured creditors has been appointed in this case.

4. The Debtor is a leading national provider of financial services, legal collections and recovery management solutions for banks, credit card issuers and investors in debt products. At its peak in early 2008, the Debtor had an infrastructure that supported 35,000 lawsuits per month, 20,000 arbitration filings per month and $55 million in collections per month.

5. The Debtor works closely with Mann Bracken LLP ("**Mann Bracken**"), a leading debt collection law firm, to service its customers.

6. Due to a decline in volume from key customers and a reduction in collection rates resulting from the recession, the Debtor's cash flow significantly decreased in during 2008 and 2009. The Debtor engaged in aggressive cost-cutting efforts. The Debtor closed two call centers and reduced its workforce from 1,069 employees to 506 employees. Today, the Debtor has approximately 50 employees in its headquarters and two remaining call centers.

7.     Prior to the Petition Date, the Debtor determined, in consultation with its professionals, that the value of its estate would be best maximized and preserved through a sale and auction process. With the support of its professionals, the Debtor embarked on a process to market and sell its assets (the "**Assets**") as a going concern.

8.     The Debtor then commenced this Chapter 11 Case to conduct a competitive auction process to sell the Assets to the highest or best bidder.

9.     I submit this First Day Declaration on behalf of the Debtor in support of the Debtor's (a) voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "**Bankruptcy Code**") and (b) "first-day" motions, which are being filed concurrently herewith (collectively, the "**First Day Motions**").[2] The Debtor seeks the relief set forth in the First Day Motions with the goal of minimizing the adverse effects of the commencement of the Chapter 11 Case on its business. I have reviewed the Debtor's petition and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtor's business and the success of the Debtor's reorganization.

10.     In furtherance of its objective of maximizing estate value through a going concern sale, the Debtor has sought approval of the First Day Motions and related orders (the "**Proposed Orders**"), and respectfully requests that the Court consider entering orders granting such First Day Motions. For the avoidance of doubt, the Debtor seeks authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Motions.

---

[2]     Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the applicable First Day Motions.

11.     I have reviewed each of the First Day Motions and Proposed Orders (including the exhibits thereto), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enable the Debtor to make the transition to, and operate in, chapter 11 with a minimum of interruption or disruption to its business or loss of productivity or value and (b) constitutes a critical element in achieving a going concern sale that maximizes the value of the Assets.

## II.     ADMINISTRATIVE AND PROCEDURAL MOTIONS

### A.     Retention Applications

12.     The retention of chapter 11 professionals is essential to the Debtor's chapter 11 efforts.  Accordingly, during the filing of these Chapter 11 Case, the Debtor anticipates that they will request permission to retain, among others, the following professionals: (a) Latham & Watkins, LLP as co-counsel; (b) Young Conaway Stargatt & Taylor, LLP as co-counsel; (c) SSG Capital Advisors, LLC, as investment banker; and (d) Epiq Systems, as noticing, claims and balloting agent.  I believe that the above professionals are well qualified to perform the services contemplated by their various retention applications, the services are necessary for the Debtor's administration of their estate and going concern sale efforts, and that the professionals will coordinate their services to avoid duplication of efforts.  I understand that the Debtor may find it necessary to seek retention of additional professionals as this Chapter 11 Case progresses.

## III.     BUSINESS OPERATIONS MOTIONS

### A.     Prepetition Taxes Motion

13.     In the ordinary course of the Debtor's businesses, the Debtor (a) collects sales taxes from its customers and incurs taxes, including, but not limited to, sales, use, income,

franchise, real property and other taxes in operating in businesses (collectively, the "**Taxes**")[3] and (b) charges fees and other similar charges and assessments (collectively, the "**Fees**")[4] on behalf of various taxing, licensing and regulatory authorities (collectively, the "**Authorities**," a listing of which is annexed to the Motion as Exhibit B) and pays Fees to such Authorities for licenses and permits required to conduct the Debtor's businesses.[5] The Taxes and Fees are paid to the respective Authorities in accordance with all applicable laws and regulations.

14.    The Debtor pays approximately $6,000 per year in gross receipts taxes, including commercial activity taxes ("**CAT Taxes**") and business and occupation taxes ("**B&O Taxes**"). Such gross receipts taxes are annual business privilege taxes measured by gross receipts from business activities in certain states. The Debtor also pays approximately $44,000 per year in franchise taxes. Franchise taxes are imposed by certain states for the privilege of allowing companies to do business in a state or to maintain a company's good standing in a state. In addition, the Debtor pays approximately $182,000 annually per year in personal property taxes. Finally, the Debtor pays de minimis annual reporting taxes, which allows the Debtor to maintain good standing in certain states.

15.    The Debtor estimates that the total amount of prepetition Taxes and Fees owing to the various authorities will not exceed approximately $70,000. Any amounts that are actually due, but have not yet been paid to the relevant governmental authorities because of the bankruptcy filings, represent a small fraction of the Debtor's total assets. Additionally, some, if

---

[3]    The Debtor has a taxable presence in 28 states.

[4]    The Debtor collects certain Fees from its customers on behalf of governmental entities. For such Fees, the Debtor is required to remit the collected amounts to the appropriate governmental entity. The Debtor hereby requests authority to pay Fees regardless of whether they constitute "trust fund" obligations.

[5]    The Debtor does not seek authority to collect and pay state and federal withholding taxes under this motion but rather requests such authority as part of the Motion to Pay Wages, Salaries and Employee Benefits filed concurrently herewith.

not all, of the applicable governmental authorities may cause the Debtor to be audited if the Taxes and Fees are not paid immediately. Such audits will unnecessarily divert the Debtor's attention away from the reorganization process. Further, if the Debtor does not pay such amounts in a timely manner, the governmental authorities may attempt to suspend the Debtor's operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estate. Finally, some of these outstanding tax liabilities are for "trust fund" taxes that the Debtor has collected and holds in trust for the benefit of the applicable governmental authority. Therefore, such funds do not constitute property of the estate and could not otherwise be used by the estate.

16. In all cases, the Debtor's failure to pay the Taxes and Fees could have a material adverse impact on its ability to operate in the ordinary course of business. Any disputes that could impact its ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtor's operations as a whole.

**B.** **Employee Obligations Motion**

**Employee Obligations**

17. <u>Salaries and Wages</u>. The average monthly payroll for the Debtor's salaried and hourly U.S. Employees is approximately $1.84 million. Salaried Employees are paid on a bi-weekly basis one week in arrears. Direct deposits and payroll checks for accrued payroll for salaried Employees through November 6, 2009 were issued on November 13, 2009. As of the Petition Date, the Debtor anticipates that there will be approximately $432,582 in earned and unpaid salary owed to salaried Employees.

18.     Hourly Employees for the Debtor are paid on a weekly basis one week in arrears.[6]  Direct deposits and payroll checks for accrued payroll for hourly Employees through November 6, 2009 were issued on November 13, 2009.     As of the Petition Date, the Debtor anticipates that there will be approximately $486,310 in earned and unpaid wages owed to hourly Employees.

19.     <u>Independent Contractors</u>.  In addition to the Employees described above, the Debtor employs approximately one independent contractor (the "**Independent Contractor**") to provide assistance with the systems integration and development of a database to track customer contracts and business information.   The Debtor believes that ensuring that the Independent Contractor is paid in the ordinary course just like the Employees is essential to the Debtor's continuing operations and, therefore, to its ability to maximize the value of its business for the benefit of its estate.  As of the Petition Date, the total accrued but unpaid wages for the Independent Contractor is approximately $14,000 based upon two contracts with the Independent Contractor.  The Debtor seeks authorization, but not direction, to pay the prepetition amounts owed to the Independent Contractor to ensure the uninterrupted employment of the Independent Contractor with the Debtor.

20.     <u>Vacations, Sick Leave and Holidays</u>.  For salaried Employees, vacation days accrue at a rate based on the Employee's length of service with the Debtor.  Employees with less than two years with the Debtor accrue ten days of vacation per year; Employees who have been with the Debtor between two and five years accrue eleven days of vacation per year; and Employees who have been with the Debtor for over five years accrue sixteen days of vacation per year.  Executives begin their vacation accrual at fifteen days per year.  For hourly

---

[6]     For hourly Employees, the weekly payment covers wages for hours worked through the relevant pay date

Employees, vacation days accrue based upon length of service for the Debtor, at the same level as received by salaried employees. The Debtor's Employees may roll over up to 80 hours of unused vacation time to the following year; however, Employees forfeit any accrued amounts of vacation over 80 hours. Upon termination of their employment, Employees are entitled to a cash payout for their unused earned vacation time for the current year. As of the last payroll period prior to the Petition Date, the Debtor has liability for accrued vacation time of approximately $659,000 if such vacation time were to be paid in cash. As of the Petition Date, the Debtor does not owe any amount of accrued sick leave or holiday pay to Employees.

21.   Existing Incentive Plan.   The Debtor offers an incentive bonus (the "**Incentive Plan**") to certain Employee constituencies at the collection level (the "**Collectors**"). Collectors are eligible to receive a monthly incentive based on collection performance. Collectors are given a target collection amount and are paid up to five percent of the collections they take in above the target. Incentives received by Collectors are capped at $4,000 per month. Also, targets are set for teams of Collectors, and if the team meets the target, each member may receive an additional incentive of $250-$500. In 2009, Debtor made $2.9 million in payments to its Employees pursuant to the Incentive Plan. As of the Petition Date, 140 Employees were eligible to receive incentives under the Incentive Plan. Each month, the Debtor pays the incentives earned in the previous month. As of the Petition Date, the incentives earned in October, 2009 have been paid in full. The Debtor will pay incentives earned in November, 2009 in December, 2009.

22.   Management Bonus Plan.   The Debtor offers a bonus plan (the "**Management Bonus Plan**") to seven executives, ten vice presidents and fifteen directors and

---

(one week in arrears) as well as adjustments for items such as overtime, overtime premium, days not worked, or changes in pay rates.

key contributors (collectively, the "**Bonus-Eligible Employees**"), certain of whom are insiders (as such term is defined in the Bankruptcy Code). Bonus-Eligible Employees are eligible to receive this annual bonus based upon the Debtor's EBITDA, cash reserves, and other financial benchmarks. Based upon the financial performance-based criteria established under the Management Bonus Plan, the Bonus-Eligible Employees will not meet the requirements necessary to earn a bonus in 2009. The Debtor does not seek authority at this time to honor or perform with respect to prepetition obligations under the Management Bonus Plan.

23. _Miscellaneous Payroll Deductions_. In addition to the deductions discussed herein, the Debtor deducts certain amounts from its Employees' paychecks to make payments on behalf of Employees for, among other things, court orders, garnishments, child support, and similar deductions and other pre-tax and after-tax deductions payable pursuant to certain miscellaneous employee benefit plans (collectively, the "**Miscellaneous Payroll Deductions**"). The Debtor subsequently forwards these deductions to appropriate third party recipients on the same day as payroll is issued.[7] The average amount of Miscellaneous Payroll Deductions per Employee is approximately $360 per month. As of Petition Date, all amounts deducted from Employees' paychecks have been remitted to the appropriate third party recipients.

**Reimbursable Business Expense Compensation Obligations**

24. In the ordinary course of the Debtor's businesses, many Employees incur a variety of business expenses that are typically reimbursed by the Debtor, pursuant to its normal business practices. The reimbursable business expenses incurred by the Employees include business travel expenses, relocation expenses (which are typically paid as lump sum bonuses),

---

[7]     Employee contributions to the 401(k) Savings Plan (as defined herein) deducted from the payroll (issued on bi-weekly Fridays) are forwarded to the 401(k) Savings Plan administrator on the following Monday.

professional memberships, professional certifications, reimbursement for attending professional seminars, and other similar items reimbursable under the Debtor's existing policies (collectively, the "**Reimbursable Business Expenses**"). Certain Employees have not yet been reimbursed for Reimbursable Business Expenses previously incurred on behalf of the Debtor primarily because the Debtor filed its chapter 11 petitions in the midst of its regular reimbursement cycle for Reimbursable Business Expenses. All Reimbursable Business Expenses were incurred with the understanding that they would be reimbursed by the Debtor. As of the Petition Date, the Debtor estimates that approximately $20,000 in Reimbursable Business Expenses have been incurred by certain Employees and have not yet been reimbursed to Employees.

**Employee Health and Welfare Programs**

25.    Health Care Programs.  In the ordinary course of its business, the Debtor provides medical, prescription drug coverage, flexible spending accounts, dental, vision, and employee assistance plans, whether through third party insurers or otherwise (the "**Health Care Programs**"). The Debtor's Health Care Programs are provided through fully insured programs administered through third parties.   For example, the medical coverage for certain of the Debtor's Employees is provided through a variety of medical plans administered by CIGNA and Excellus Blue Choice.   The Debtor also utilizes CIGNA to provide dental insurance plans, EyeMed to provide vision insurance plans and Business Health Solutions to provide employee assistance plans under the Health Care Programs. The Health Care Programs are funded through contributions by the Debtor and participating Employees.   The percentage contributed by an Employee varies depending on, among other things and whether Employees' family members, partners, or dependents are covered under the Health Care Programs. On average, the Debtor's share of the cost of the Health Care Programs is approximately $260,000 per month, including

claim payments, premiums, and administrations fees. The Health Care Programs are paid in full through October 31, 2009.

26. <u>Employee Welfare Programs.</u> In the ordinary course of business, the Debtor also provides long and short-term disability insurance, life insurance, accidental death and dismemberment insurance, and other related insurance to its Employees (the "**Employee Welfare Programs**").

27. The Debtor provides Employees the opportunity to purchase short-term disability benefits ("**Short-Term Disability Benefits**"). Employees who purchase Short-Term Disability Benefits pay for the full benefit and the Debtor bears no cost for providing Short-Term Disability Benefits.

28. The Debtor currently provides approximately 499 Employees with long-term disability benefits ("**Long-Term Disability Benefits**"). The Long-Term Disability Benefits are insured and administered through Reliance Standard. The approximate monthly cost to the Debtor for Long-Term Disability Benefits is $7,000 per month, including premium payments and administration fees.

29. The Debtor provides basic and supplemental life insurance and basic and supplemental accidental death and dismemberment insurance coverage ("**Life/AD&D Insurance**") to 499 of its eligible Employees through Reliance Standard. The Debtor's approximate monthly cost for providing Life/AD&D Insurance to its Employees is $14,000, including claim payments, premiums, and administration fees.

30. Furthermore, the Debtor provides Employees with flexible spending account plans, pursuant to which approximately 78 Employees currently maintain flexible spending accounts for healthcare and dependent care expenses. Flexible spending accounts are

composed entirely of Employee contributions with average monthly Employee payroll deductions of $481 per Employee in 2009. The Debtor believes that such amounts are being held in trust for the benefit of those contributing Employees and, therefore, are not property of the Debtor's bankruptcy estate. Nonetheless, out of an abundance of caution, the Debtor seeks the approval of this Court to continue this program and reimburse Employees in the ordinary course.

31. On average, approximately 3.93% is withheld from Employee payroll as the required contributions to the above-mentioned Health Care Programs and Employee Welfare Programs. The percentage withheld varies depending on, among other things, the benefit program elected and the employee group of the benefit recipient.

**Workers Compensation Obligations**

32. Under the laws of the various jurisdictions in which they operate, the Debtor is required to maintain workers' compensation policies and programs and to provide Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtor. Accordingly, the Debtor maintains workers' compensation programs in all states in which they operate pursuant to the applicable requirements of local law.

33. The Debtor insures its workers' compensation liabilities through a workers' compensation policy issued by Travelers Casualty Insurance Company of America ("**Travelers**"). The Debtor's aggregate annual premium payment to Travelers for workers' compensation insurance is $104,253. The Debtor pays no deductibles under the Travelers policy.

34. The Debtor's outstanding obligations relating to workers' compensation arise from incurred but not paid claims ("**IBNP**") and incurred but not reported claims

("**IBNR**"). The Debtor estimates its IBNR through an actuarial process that is common in the insurance industry. As of the Petition Date, no IBNP claims were pending against the Debtor arising out of Employees' alleged on-the-job injuries. The Debtor expects to make no cash payments related to workers' compensation claims for the next 12 months, because such claims rarely exceed the amount of coverage provided by Travelers. Only three workers' compensation claims were filed against the Debtor in 2009. By this Motion, the Debtor seeks authority, but not direction, to pay amounts related to workers' compensation claims that arose prior to the Petition Date as they become due and to continue honoring all workers' compensation obligations in the ordinary course of business.

## Employee 401(k) Savings Plan

35.     Prior to the Petition Date, and in the ordinary course of business, the Debtor maintained a defined contribution plan (the "**401(k) Savings Plan**"), for the benefit of its Employees. The Debtor sponsors the 401(k) Savings Plan, which permits certain Employees to contribute a percentage of their gross pay to the 401(k) Savings Plan as a tax-deferred contribution. The 401(k) Savings Plan is administered and sponsored by MassMutual, which also serves as the 401(k) Savings Plan trustee. The 401(k) Savings Plan provides for automatic pre-tax salary deductions of eligible compensation up to the limits set by the Internal Revenue Code. The approximate aggregate amount withheld this year from Employees' paychecks pursuant to the 401(k) Savings Plan, inclusive of Employee contributions and loans, is approximately $866,000. The Debtor suspended making matching contributions to the participating Employees' accounts in the 401(k) Savings Plan in March of 2009. During January, February and March of 2009, the Debtor matched the Employee contributions in the amount of $206,000. The Employees' contributions to the 401(k) Savings Plan are not property of the Debtor's estates, but constitute funds held in trust for the benefit of the Employees.

Employees pay the ancillary administrative expenses associated with the 401(k) Savings Plan, so there is no cost to the Debtor to maintain the 401(k) Savings Plan. The Debtor requests to continue the 401(k) Savings Plan for participating Employees, at their sole discretion and in the ordinary course of business, and to remit any prepetition amounts withheld thereunder.

**Obligations to Severed Employees**

36.     <u>COBRA Obligations</u>.  As of the Petition Date, there were 53 Severed Employees receiving COBRA benefits ("**Continued Healthcare Benefits**").  Further, as of the Petition Date, there were 199 Severed Employees that are eligible but have not yet elected Continued Healthcare Benefits.  Therefore, in the event that a Severed Employee makes such an election after the Petition Date, by this Motion, the Debtor requests authority to pay prepetition and postpetition Continued Healthcare Benefits to such Severed Employees.  The Debtor believes that there is no outstanding liability related to Continued Healthcare Benefits as of the Petition Date.

37.     Additionally, the American Recovery and Reinvestment Act of 2009 (the "**ARRA**") provides for an employer subsidy of COBRA premiums for involuntarily terminated employees.  Under the ARRA, an employee who becomes eligible for COBRA between September 1, 2008 and December 31, 2009 due to a covered employee's involuntary termination of employment will only be required to pay 35 percent of his or her COBRA premium.  The remaining 65 percent of the COBRA premium will be paid for by the employer and then reimbursed by means of a payroll tax credit to the employer.  As of the Petition Date, approximately 28 of the Debtor's Severed Employees elected COBRA and may be eligible for employer subsidized COBRA under the ARRA.  As the Petition Date, the Debtor estimates that there are approximately 199 Severed Employees who may elect COBRA (and the ARRA

subsidy) after receiving notice. By this Motion, the Debtor seeks authority to honor all obligations related to COBRA premiums subsidies for eligible individuals under the ARRA.

**Miscellaneous Programs**

38.  <u>Miscellaneous Benefits</u>.  The Debtor provides a number of other miscellaneous benefits to Employees.  For example, the Debtor has a military leave policy which provides Employees in the military reserve a payroll reimbursement to ensure that their Employees' income while attending annual two week training duty, after accounting for what they receive from the government, is equivalent to what the Employees were receiving from the Debtor prior to the military leave.  The Debtor's military leave policy also reinstates Employees returning from military duty.  The Debtor also offers other types of leave, such as jury duty, medical leave, and time-off benefits, such as floating holidays and bereavement days.  The Debtor believes that the amounts owing on the Petition Date under all of these and other miscellaneous benefits are negligible.  By this Motion, the Debtor seeks authority, but not direction, to pay any outstanding prepetition obligations under any of the miscellaneous benefit programs and to continue these benefits postpetition.

39.  <u>Administration of Payroll Taxes</u>.  As is customary in the case of most large companies, the Debtor utilizes the services of ADP to administer its payroll taxes.  The administration services cost the Debtor approximately $15,000 per month.  The Debtor requests that they be authorized, but not directed, to pay the various costs incident to maintaining, or paying third parties to maintain and provide, record keeping relating to the various Employee benefit programs identified in this Motion that may be outstanding as of the Petition Date.  The Debtor believes that these unpaid processing costs will be de minimis.

**Employment and Withholding Taxes**

40.     The Debtor accrues, in the ordinary course of business, state, local and federal employment and withholding taxes as wages are earned by the Debtor's Employees. These taxes are calculated based on statutorily mandated percentages of earned wages. Historically the Debtor has timely paid all federal, state and local Employment and Withholding Taxes to the relevant Taxing Authority, usually on a per pay period basis. In 2009, the Debtor's payroll taxes, including both the employee and employer portion, were approximately $8.2 million. The Employment and Withholding Taxes constitute so-called "trust fund" taxes which are required to be collected from third parties and held in trust for payment to the taxing authorities, and thus, are not property of the Debtor's estate under Section 541(d) of the Bankruptcy Code. As of the Petition Date, the Debtor estimates that the amount of accrued and outstanding prepetition obligations with respect to the payroll taxes to be $120,000.

C.     **Cash Management Motion**

41.     Prior to the commencement of these cases, in the ordinary course of business, the Debtor maintained approximately 6 bank accounts (the "**Bank Accounts**") at Wachovia Bank, N.A. ("**Wachovia**"). The Bank Accounts include those maintained as operating accounts, client clearing accounts, general accounts, money market accounts, and payroll accounts. On November 7, 2009, Wachovia notified the Debtor that the Debtor must close the Bank Accounts. In accordance with this notification, the Debtor will close the Bank Accounts and open new accounts at a new bank. However, the process of opening the new accounts in a systematic and controlled manner such that it will not disrupt the Debtor's operations may take several months. The Debtor believes it is essential that they be permitted to continue to maintain existing Bank Accounts until the Bank Accounts can be closed and new accounts opened in an orderly and controlled manner (and notice given to the U.S. Trustee of such newly opened accounts), wherever they are needed, irrespective of whether such banks are designated

depositories in the District of Delaware; <u>provided</u> <u>however</u>, that any new bank account opened by the Debtor shall be with a bank that is insured by the FDIC or the FSLIC and organized under the laws of the United States of America or any state therein and shall be designated a "debtor-in-possession" or "DIP" account by the respective bank.

    42.  Prior to the commencement of these cases, the Debtor used a complex centralized cash management system to collect, transfer, and disburse funds generated by its operations and to accurately record all such transactions as they are made (the "**Cash Management System**"). The Debtor's Cash Management System includes accounting controls needed to enable the Debtor, as well as creditors and the Court, if necessary, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. When manual transactions are made in the system, the Debtor closely monitors the accounts to ensure the transactions are appropriately documented. The cash management procedures utilized by the Debtor are ordinary, usual and essential business practices, and are similar to those used by other corporate enterprises. The Cash Management System provides significant benefits to the Debtor, including the ability to control corporate funds centrally, segregate cash flows, ensure availability of funds when necessary, and reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information. The operation of the Debtor's business requires that the Cash Management System continue during the pendency of the Chapter 11 Case. Requiring the Debtor to adopt a new cash management system at this critical stage of this case would be expensive, would create unnecessary administrative burdens and problems (including the possibility that transactions might not be adequately documented), and would likely disrupt and adversely impact the Debtor's ability to maintain normal operations while pursuing a sale.

Indeed, requiring Cash Management System changes could irreparably harm the Debtor, its estate and its creditors by creating cash flow interruptions while systems were changed. Maintenance of the existing Cash Management System is therefore in the best interests of all creditors and other parties-in-interest.

43.    The Debtor also seeks authorization to continue using all correspondence and business forms (including without limitation, letterhead, purchase orders, and invoices), without reference to the Debtor's status as debtor in possession. Most parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as debtor in possession as a result of the press releases issued by the Debtor, and any additional press coverage. Moreover, each of the Debtor's vendors will receive direct notice of the commencement of this case. The Debtor believes changing correspondence and business forms would be expensive, unnecessary, and burdensome to the Debtor's estate and disruptive to the Debtor's business operations and would not confer any benefit upon those dealing with the Debtor. For these reasons, the Debtor requests that it be authorized to use existing checks and business forms without being required to place the label "Debtor-in-Possession" on each.

44.    Finally, the Debtor believes that its use of the Bank Accounts, including the Debtor's money market account, substantially conforms with the approved investment practices identified in section 345 of the Bankruptcy Code, and that all deposits and investments into the money market account are safe, prudent and designed to yield the maximum reasonable net return on the funds invested. Nonetheless, out of an abundance of caution, to the extent that such deposits and investments do not conform with the approved investment practices identified in section 345 of the Bankruptcy Code, the Debtor seeks a waiver of such requirements.

D.    **Utilities Motion**

45.     In the operation of its facilities, the Debtor incurs utility expenses for, among other things, water, sewer service, electricity, natural gas, propane, telephone and internet service (collectively, the "**Utility Services**") in the ordinary course of business. These Utility Services are provided by approximately six (6) providers (collectively, the "**Utility Providers**"), including those listed on <u>Exhibit C</u> to the Motion (the "**Utility Service List**"). On average, the Debtor spends approximately $280,161.79 each month on Utility Services. The Debtor has historically paid the Utility Providers promptly and in full. In light of this, the Debtor believes that the proposed Adequate Assurance Deposit (as defined below) is more than sufficient to provide the Utility Providers with adequate assurance of payment.

46.     Uninterrupted Utility Services are essential to the Debtor's ongoing business operations. Should the Utility Providers refuse or discontinue service, even for a brief period, the Debtor's business operations would be severely disrupted. In particular, such discontinuation would irreparably disrupt the Debtor's ability to operate its facilities, which would negatively affect customers, cash flow and, ultimately, value and creditor recoveries. Simply put, without Utility Services, the Debtor's operations will shut down. It is, therefore, critical that Utility Services continue uninterrupted.

**E.      Insurance Motion**

47.     In connection with the operation of its business, the Debtor maintains various Insurance Policies. The Insurance Policies include, but are not limited to, coverage for workers' compensation claims, automobile claims, claims for losses due to crime, directors' and officers' liability, certain general and excess liability claims and various casualty and property-related liabilities. The third-party claims that are covered by the Insurance Policies are neither unusual in amount, nor in number, in relation to the extent of the business operations conducted by the Debtor. The Debtor estimates that, for policies currently in place, monthly insurance

premiums to be paid under this Motion will be approximately $44,600 and the monthly obligations on account of the Finance Agreements to be paid under this Motion will be approximately $650.

48.     The Debtor believes that maintenance of insurance coverage under the various Insurance Policies is essential to the continued operation of the Debtor's business and is required under the United States Trustee's Operating Guidelines For Chapter 11 Cases (the "**Operating Guidelines**"), and the laws of the various states in which the Debtor operates. Thus, the Debtor submits that it should be authorized, but not directed, to continue to pay Insurance Policy premiums as such premiums come due in the ordinary course of the Debtor's business.

49.     The Debtor has financed certain of its insurance premiums under finance agreements with the various insurance underwriters and finance companies (the "**Finance Agreements**"). Pursuant to the Finance Agreements, the Debtor makes monthly payments on the insurance premiums due under the Insurance Policies, rather than paying the entire premiums at the beginning of each policy term, and pays a monthly financing fee in addition to the monthly payment on the insurance premium. In the Debtor's business judgment, the terms of the Finance Agreements represent the best possible terms for financing the premiums of the Insurance Policies. The Debtor's estate will benefit by maintaining this low-cost financing. Moreover, any interruption of payments might adversely affect the Debtor's ability to obtain financing for future policies on favorable terms. In some cases the coverage is required by regulations, laws, and/or contracts that govern the Debtor's business obligations.[8] Thus, the Debtor requests the authority to continue honoring its obligations pursuant to the Finance Agreements.

---

[8]     For example, insurance coverage is required under the operating guidelines established by the Office of the United States Trustee. See 3 United States Trustee Manual § 3-3.2.3 (Oct. 1998) ("A debtor must obtain appropriate insurance coverage, and documentation regarding the existence of the coverage must be provided to the [Office of the] United States Trustee as early in the case as possible.").

F.     **Essential Trade Vendor Motion**

50.     The Debtor is highly mindful of its fiduciary obligations to seek to preserve and maximize the value of its estate. Accordingly, the preservation and maximization of the going concern value of the Debtor's business, including the preservation of key business relationships, are among management's primary goals as the Debtor transitions into chapter 11 and pursues a going concern sale. Providing seamless service to customers is key to meeting those goals. For these reasons, the Debtor seeks to minimize the adverse business effects — as well as the cash flow impact — of its chapter 11 filing to the fullest extent possible by obtaining authority to reimburse certain vendors that are of paramount importance to its business operations for certain prepetition expenses.

51.     As a provider of legal collections and recovery management solutions, the Debtor routinely relies on the services of various attorneys to assist the Debtor by instituting lawsuits against individuals and entities that have not honored their obligations to the Debtor's clients (the "**Clients**"). Like the Debtor, those attorneys are retained by the Debtor's Clients and provide legal services on the Clients' behalf.

52.     The vast majority of the legal collections work for the Clients is handled by Mann Bracken, LLP ("**Mann Bracken**"), but the Debtor regularly works with over 100 attorneys or law firms (such attorneys or firms other than Mann Bracken, the "**Network Attorneys**," and, together with Mann Bracken, the "**Essential Suppliers**").

53.     In the ordinary course of their provision of legal services on behalf of the Clients, the Essential Suppliers advance filing fees and other court costs and pay process server costs on behalf of Clients and in conjunction with the legal collections and recovery management solutions services supplied to the Clients by Axiant (the "**Court Costs**"). The Debtor typically repays Court Costs incurred by the Essential Suppliers when the Clients pay the Debtor the fees

and expenses associated with the collections, and the Debtor then delivers the portion of such funds representing such Essential Suppliers' fees and expenses to the Essential Suppliers.

54.     As of the Petition Date, Mann Bracken is owed approximately $6,500,000 in Court Costs by the Debtor.    As of the Petition Date, the Network Firms are owed approximately $1,200,000 in Court Costs in the aggregate by the Debtor.

55.     The Debtor believes that if it does not continue, post-petition, to reimburse Mann Bracken and the Network Firms for the Court Costs, including those that accrued prior to the Petition Date, then (i) certain or all of the collections lawsuits instituted by Mann Bracken and the Network Firms may be dismissed, (ii) Mann Bracken and/or the Network Firms may cease to provide services to the Debtor, and (iii) the effectiveness of the Debtor's services would be significantly and materially harmed, jeopardizing the Debtor's revenue stream and the value of the Debtor's business as a going concern.

56.     The Debtor also requests that its banks honor, unless otherwise directed by the Debtor, any and all checks or electronic transfers used by the Debtor prepetition to pay any of the Court Costs owing to the Essential Suppliers that have not cleared the banking system prior to the Petition Date and any and all checks or electronic transfers used by the Debtor postpetition to pay any prepetition Court Costs of the Essential Suppliers.

57.     The Debtor's management and employees have exercised high levels of care in reviewing the facts and circumstances of its business and have limited the request herein to payment of the Court Costs, which is necessary to avoid material business disruptions of the kinds described above if the Debtor does not obtain the relief sought herein.

## IV.     FINANCING AND SALE MOTIONS

### A.     Cash Collateral Motion

58.     Prepetition Credit Documents.  As of the Petition Date, the Debtor was indebted to the Lender, and the Claimant asserts certain claims, each as described below:

       a.      Pursuant to that certain Axiant, LLC Note Purchase Agreement by and between the Debtor and the Lender (the "**Note Purchase Agreement**"), the Lender purchased $5,533,488 of principal amount of senior secured notes (the "**Notes**", and together with the Note Purchase Agreement, the "**Loan Documents**").  The Note is secured by a senior secured lien upon substantially all of the Debtor's assets that existed on the Petition Date (the "**Prepetition Collateral**").

       b.      The Claimant asserts that it is the owner of various accounts receivable ("**Claimant's A/R**") that are owed by parties that have contracts with Claimant and do not have contracts with the Debtor (such parties, other than Discover Card or any Discover entity, the "**Claimant Clients**").  In addition, the Claimant asserts that it is the owner of accounts receivable owed by Discover Card (the "**Discover Receivables**").  The Claimant and the Debtor agree that the Claimant's A/R is property of Claimant and is not property of the Debtor's estate, although the Debtor may have a claim against the Claimant and/or the Claimant's A/R for administrative services relating to the Claimant's A/R.  The Claimant asserts, and the Debtor and the Lender dispute, that the Claimant is the owner of the Discover Receivables and that the Discover Receivables are not property of the Debtor's estate.  The Debtor and the Lender maintain that the Discover Receivable is property of the Debtor's estate and part of the Cash Collateral.  To the extent not resolved herein, the parties will resolve such issue at a later time either by agreement or a court determination.

59.     Prepetition Indebtedness.  As of the Petition Date, the principal amount of the Debt owed to Lender by Debtor, exclusive of accrued but unpaid interest, costs, fees and expenses, was not less than approximately $5,533,488.

60.     Prepetition Liens.  To secure the Secured Debt, the Debtor granted to the Lender first priority security interests and liens (collectively, the "**Prepetition Liens**") on Prepetition Collateral in which the Debtor has an interest pursuant to the Loan Documents.

61.     Validity of Secured Debt Prepetition Liens.  The Debtor acknowledges and agrees that the Loan Documents are valid and binding agreements and obligations of the Debtor and that the Prepetition Liens (i) constitute valid, binding, enforceable and perfected first priority liens, and (ii) are not subject to avoidance, reduction, disallowance, impairment or

subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtor further acknowledges and agrees that (i) the Secured Debt constitutes the legal, valid and binding obligation of the Debtor, enforceable in accordance with its terms, (ii) no objection, offsets, defenses or counterclaims of any kind or nature to the Secured Debt exist, and (iii) the Secured Debt and any amounts previously paid to the Lender on account of the Secured Debt are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtor further acknowledges that the amount of the Secured Debt that is due and payable to the Lender, is a secured claim and if and to the extent it is ultimately determined pursuant to section 506(b) of the Bankruptcy Code that the claim of Lender for payment of the Secured Debt is secured by Prepetition Collateral having a value as of the Petition Date that exceeds the amount of such claim, then, to the extent of such excess, the Lender, shall be entitled to an allowed secured claim for (i) post-petition interest on such claim and (ii) any reasonable fees, costs and charges provided for under the Loan Documents. The Debtor acknowledges and agrees that the Lender perfected its security interests and liens in and on the Prepetition Collateral in which the Debtor has an interest by the filing of UCC-1 financing statements against Debtor (the "**Prepetition Financing Statements**") with the proper state and county offices.

62. <u>Debtor's Intentions in Chapter 11</u>. Prior to the Petition Date, the Debtor engaged in a limited marketing process for the sale of its business. The Debtor has located a buyer to serve as a "stalking horse" for an expedited auction process. With certain cash flow considerations and the pressure of certain litigation bearing down on the Debtor, the Debtor thought it prudent to commence chapter 11 proceedings at this time and to continue to pursue a sale in chapter 11. The Debtor intends to operate its business and dispose of the Debtor's assets

through a "going-concern" sale in chapter 11. The Debtor believes that a chapter 11 sale process, under the supervision of this Court and with the participation of key employees, will enable the Debtor to maximize the recoveries of all parties in interest as promptly as is practicable under the circumstances.

63.     Exigent and Extraordinary Circumstances.  A critical need exists for the Debtor to use Cash Collateral in order to continue the operation of its business.  If the Debtor's use of Cash Collateral were to be discontinued, its remaining operations would be severely disrupted, it would be unable to pay operating expenses and unable to operate its business in an orderly manner, thereby severely impairing the value of its assets and its ability to sell its business as a going concern.  Accordingly, the Debtor and its estate will suffer immediate and irreparable harm unless the Debtor is immediately authorized to use Cash Collateral.

**B.     Sale Motion**

64.     Prior to the Petition Date, the Debtor, its professionals, and other interested parties considered a number of potential sales and restructuring alternatives in order to develop a plan that would maximize value for its creditors and to ensure the long-term survival of its business.

65.     Beginning in July 2008, the Debtor began to experience significant cash flow difficulties and carried approximately $75 million of debt.  The cash flow difficulties were driven in large part to global economic conditions.  At that time, the Debtor began to contact various financial institutions, however, none of the parties who were contacted were interested in investing more money in the Debtor's business.  Shortly thereafter, the Debtor began to market the business in earnest.  The Debtor contacted approximately 19 different financial purchasers and at least 8 of those parties executed confidentiality agreements which allowed the potential purchasers access to the Debtor's confidential business information.  Approximately three or

four of the interested financial purchasers also began conducting due diligence investigations of the Debtor's business. More recently, the Debtor has expanded its marketing efforts to include other potential financial purchasers as well as competitors of the Debtor's business.

66.     After an extensive review, the Debtor, with the approval of its board of directors, selected NCO Group, Inc., or its assignee(s) or designee(s), to be the stalking horse bidder (the "**Stalking Horse Bidder**") for the sale of substantially all of the Debtor's assets (the "**Assets**"). The Debtor and its advisors actively negotiated with the Staking Horse Bidder regarding the terms and conditions of a binding term sheet (the **Term Sheet**") and facilitated various due diligence requests made by the Staking Horse Bidder's representatives and advisors. On or about November 20, 2009, the Debtor and the Stalking Horse Bidder executed the Term Sheet pursuant to which the Debtor and the Stalking Horse Bidder have agreed to enter into an asset purchase agreement ("**APA**") pursuant to which the Stalking Horse Bidder will acquire substantially all of the Assets.

67.     After considering its options and the economic realities of its business, liquidity position, and this Chapter 11 Case, I believe that the floor established by a purchase of substantially all of the Assets by the Stalking Horse Bidder pursuant to terms set forth in the Term Sheet (the "**Proposed Sale**"), subject to higher and better bids pursuant to a Bankruptcy Court approved auction process pursuant to Section 363 of the Bankruptcy Code, affords the Debtor the best opportunity to maximize value for its Assets and its estate.

68.     Accordingly, the Debtor has proposed the timeline set forth below for the sale of the Assets. The Debtor recognizes that the timeline described below calls for a fairly expedited sale process, however, due to the Debtor's current liquidity position and the lack of financing available to it, I believe that this timeline is its only option which ensures that the

Debtor will have sufficient funds to operate through the closing of a sale, which will allow it will preserve as many jobs as possible and be in a position to deliver a "going concern" business to the Stalking Horse Bidder or other potential buyer.

- **December 14, 2009**:      **Bidding Procedure Procedures Hearing**
- **January 20, 2010**:      **Submission Deadline for Qualified Bids**
- **January 25, 2010**:      **Auction**
- **January 27, 2010**:      **Proposed Sale Hearing**
- **February 9, 2010**:      **Closing of Sale**

69.      The Debtor intends to continue to aggressively solicit potential purchasers in accordance with the Bidding Procedures. In that regard, on November 13, 2009, the Debtor retained SSG Capital Advisors, LLC ("**SSG**") as its investment banker to assist with its continued sales and marketing efforts.

70.      The Debtor desires to receive the greatest value for the Assets and to preserve as many jobs as possible. Although the Debtor has undertaken certain efforts to market the Assets over the past year, in order to reach a broader pool of possible purchasers and to seize on possible sale opportunities before any decline in value, I believe that it is imperative that the Debtor promptly move forward with approval and implementation of the Bidding Procedures. Accordingly, the Bidding Procedures were developed consistent with the Debtor's need to expedite the sale process, but with the objective of promoting active bidding that will result in the highest and best offer the marketplace can sustain for the Assets. Moreover, the Bidding Procedures reflect the Debtor's objective of conducting an auction in a controlled, but fair and open, fashion that promotes interest in the Assets by financially-capable, motivated bidders who are likely to close a transaction.

71.      While the Debtor expects to execute the APA with the Stalking Horse Bidder that will implement the Term Sheet and will file such APA no later than five business

days before the Bidding Procedures Hearing, if the Debtor and the Stalking Horse Bidder are unable to agree on the terms of an APA, the Debtor will seek authority to commence an open auction process without a stalking horse bidder at the Bidding Procedures Hearing.

72.     The Stalking Horse Bidder and certain other potential bidders (collectively, the "**Potential Bidders**") may request information with respect to certain Assigned Contracts (as defined in the Term Sheet) some of which may contain confidentiality provisions. Accordingly, by this Motion, notwithstanding the existence of such a confidentiality provision, the Debtor seeks, among other things, the authority to provide Potential Bidders who have executed a confidentiality agreement with a copy of any Assigned Contract.

73.     Given the Debtor's available liquidity and its need to sell the Assets on an expedited basis, the I do not believe that the approval of the Bidding Procedures, including the Break-Up Fee and Expense Reimbursement Fee, will chill any bidding at this juncture.  To the contrary, approval of the Bidding Procedures is in the best interests of the Debtor, its estate and its creditors in that it provides a structure and format for all potentially interested parties to equally formulate a bid for the Assets and participate in the sale process.  The Bidding Procedures provide a structure and format that encourages all bidders to submit the highest and best offers for all of the Assets.  The Debtor may select any combination of bids that provides the highest and best value to the Debtor and its estate as the Successful Bid(s).  Failure to approve the Bidding Procedures may jeopardize a sale to the detriment of the Debtor's estate and its creditors.

74.     By this Motion, the Debtor seeks: (a) entry of the Bidding Procedures Order after a hearing to consider the Bidding Procedures, (b) approval of the Bidding Procedures for the proposed sale of substantially all of the Debtor's Assets, (c) the scheduling of the Sale

Hearing and approval of the Notice of Auction and Sale; (d) the establishment of procedures for the assumption and assignment of certain executory contracts and unexpired leases, including the Cure Amount Notice; and (e) authorization of the payment of a Break-Up Fee and Expense Reimbursement Fee.

## V.     CONCLUSION

75.     The Debtor's ultimate goal is to maximize the value of its assets through a sale process.  In the near term, however, to minimize any loss of value of its business during the Chapter 11 Case, the Debtor's immediate objective is to maintain a business as usual atmosphere during the early stages of the Chapter 11 Case, with as little interruption or disruption to the Debtor's operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives will be substantially enhanced.

76.     I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is us just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20ᵗʰ day of November, 2009.

<div style="margin-left: 40%;">

**Axiant, LLC**
Debtor and Debtor-in-Possession

_____
Keith Bolt
Executive Vice President and Chief Financial
Officer

</div>